UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOHN SCHNEIDER, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 3:14-cv-00217-VAB |
| | : | |
| REGENCY HEIGHTS OF WINDHAM, LLC, | : | |
| REGENCY HEALTHCARE MANAGEMENT, | : | |
| LLC, and CIENA HEALTHCARE | : | |
| MANAGEMENT, INC., | : | |
| Defendants. | : | |

**RULING ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Plaintiff, John Schneider, brought this action against his former employers, Defendants

Regency Heights of Windham, LLC and Regency Healthcare Management, LLC, and Ciena

Healthcare Management, Inc., a company that provided management services to the other

Defendants.  Mr. Schneider alleges that Defendants discriminated against him on the basis of his age,

in violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621, *et

seq*. ("the ADEA") and the Connecticut Fair Employment Practices Act, Connecticut General

Statutes § 46a-60, *et seq*. ("CFEPA").  Defendants move for summary judgment on all of Mr.

Schneider's claims.  For the reasons that follow, their motion is DENIED.

**I.   Factual Allegations[1]**

Defendant Regency Heights of Windham, LLC ("Regency Heights") is the former operator

of a skilled nursing facility located at 595 Valley Street in Willimantic, Connecticut (the "Windham

Facility" or "Facility").  Def.'s L. R. 56(a) Stmt., ECF No. 63-2, ¶1.  Regency Heights began

operating the Windham Facility in September 2009.  *Id.*  In December 2014, after this case was filed,

JACC Healthcare Center of Windham, LLC d/b/a Vanderman Place, acquired ownership of the Windham Facility.  *Id.*  During the period of time that is relevant to this dispute, defendant Regency Healthcare Management, LLC ("Regency Healthcare") provided management services to Regency Heights, along with three other facilities in Connecticut. *Id.* at ¶2.  The third Defendant, Ciena Healthcare Management, Inc. ("Ciena") is a Michigan corporation that provides management services to skilled nursing facilities, including Regency Healthcare.  *Id.* at ¶3.  Ciena also provided limited human resource services to the Windham Facility.  *Id.*

Plaintiff began working at the Windham Facility on May 11, 1998 and worked there until he was terminated on November 9, 2012.  Def.'s L. R. 56(a) Stmt., ¶4. The parties dispute whether his title was Maintenance Director or Maintenance Supervisor.  *See* L. R. 56 Stmts., ¶7-8.  *See also* Pl.'s Opp. Mem., Ex. ZZ, ECF No. 66-14, Schneider Dep., 15:23-16:9.  Mr. Schneider supervised Windham Facility's maintenance services and preventative maintenance program and was "responsible for upkeep of the Facility's physical plant, equipment and supplies." *Id.* at ¶7.  Plaintiff sometimes used the e-mail address windham_maintenance@regencyhc.com.  Pl.'s Opp. Mem., Ex. 15, ECF No. 66-15, Deposition Exhibits, 60 (Ex. 10, Oct. 25, 2012 e-mails).

Mr. Schneider's direct supervisor was Mr. Thomas Harris, the Facility's Administrator, who began working in that position when he replaced John Hooker in March 2012.  Def.'s L. R. 56(a) Stmt., ¶5.  As the Administrator, Mr. Harris was responsible for the overall management, leadership, growth, and profitability of the Windham Facility and was "expected to supervise management staff," including department heads like Mr. Schneider.  *Id*. at Ex. B, Harris Aff., ECF 63-3, ¶4.  Mr. Harris worked for Regency Heights of Windham, LLC, but used the e-mail address windham_admin@regencyhc.com.  *See* Pl.'s Opp. Mem., Ex. QQ, ECF No. 66-5, Def.'s Initial

---

[1] The relevant facts are taken from Defendants' Local Rule 56(a)(1) Statement and Exhibits attached to the Local Rule 56(a)1 Statement, ECF Nos. 63-2 and 63-3, and Plaintiff's Local Rule 56(a)(2) Statement, ECF No. 66-2 and

2

Responses, 6 (n. c.); Def.'s L.R. 56(a) Stmt. at Ex. B (emails).

Mr. Harris consulted with Mr. Steven Vera and was Mr. Vera's "direct report."  Pl.'s Opp.

Mem., Ex. YY, ECF No. 66-13, Harris Dep., 80:6.  Mr. Vera began working as Regional Director of

Operations ("RDO") for Regency Healthcare in September 2011.  As RDO, Mr. Vera "provided

leadership, support, and guidance to management and staff at each Facility, including the

Administrator."  Def.'s L.R. 56(a) Stmt., Ex. A, ECF No. 63-3, Vera Aff. ¶6.  Mr. Vera reported to

Kristine Halsey, Chief Operating Officer at Ciena Healthcare Management, Inc.  *Id*. at ¶5.

Mr. Harris and Mr. Vera would sometimes have "conversations about [Mr. Schneider's]

performance."  Pl.'s Opp. Mem., Ex. YY, Harris Dep., 78:1-4.  At one point, Mr. Vera told Mr.

Harris "that the building [was] still was not up to acceptable standards and that it was likely a result

of John [Schneider]'s leadership in the maintenance department."  *Id.* at 75: 6-11.  Later, Mr. Harris

consulted with Mr. Vera concerning specific incidents that made him concerned about Mr.

Schneider's performance.  He also consulted with Mr. Vera when he decided to terminate Mr.

Schneider in late October 2012.  *Id.* at ¶45.  *See also* Pl.'s Opp. Mem., Ex. YY, Harris Dep., 80:6.

However, Mr. Vera testified that a decision about discipline—including whether to issue warnings to

staff that he supervised or to place people on performance plans—would be Mr. Harris's "decision,

not mine."  Pl.'s Opp. Mem., Ex. WW, ECF No. 66-11, Vera Dep., 15:1-6.

In November 2012, Defendants terminated Mr. Schneider's employment and replaced him

with a younger employee.  Mr. Harris proposed the termination to other employees of the

Defendants.  In an e-mail to Kristine Halsey, Chief Operating Officer at Ciena; Nancy Erwin,

Director of Human Resources at Ciena, and Mr. Vera, Mr. Harris suggested that Mr. Schneider be

terminated.  Def.'s L. R. 56(a) Stmt., ¶45.  In the e-mail he described two incidents that caused him

to be concerned about Mr. Schneider's performance.  *Id.* at Ex. B-5.  He also indicated Mr.

Schneider's age.  *Id.* ("John's DOH is 05/11 /1998. DOB is 08/07/1949 (63 y.o.)").  In subsequent e-mails, Ms. Halsey, Ms. Erwin and Mr. Vera all agreed to the termination decision.  *Id.*  The record contains evidence explaining the two incidents in detail.  Both incidents are further described below.

### 1. Mr. Schneider's Handling of Maintenance Requests over the Weekend of July 21 and July 22, 2012

On July 24, 2012, Mr. Harris issued a Notice of Corrective Action – Final Written Warning to Mr. Schneider because of two maintenance-related incidents that occurred over the course of one weekend in July 2012.  Def.'s L. R. 56(a) Stmt., ¶12, ¶¶27-28.  Mr. Schneider had no disciplinary notices in his file until this date.  *See Id.* at Ex. B-1, Notice of Corrective Action.

The parties seem to agree that Mr. Schneider's position involved some type of weekend availability.  While there is no reference to a requirement to be on call in Mr. Schneider's job description, he testified that he was aware of an expectation that he "be available outside of [his] regular working hours."  *See* Def.'s L. R. 56(a) Stmt., Ex. D, ECF No. 70, Schneider Dep., 78:3-7; Pl.'s Opp. Mem. Ex. YY, Harris Dep., 99:9-100:5.

David Benedict, the Facility's Maintenance Assistant, was also available after hours.  Def.'s L.R. 56(a) Stmt., ¶9.  Mr. Schneider and Mr. Benedict both suggested on the record that they either alternated weekends or shared responsibility for weekend call, depending on the weekend's plans.  *See* Pl.'s Opp. Mem., Ex. 4, Benedict Aff. ¶¶8-10; *Id.* at Ex. 2, Schneider Aff., ¶8.  Mr. Harris also indicated that he had learned early in his tenure as Administrator that Mr. Benedict was on call most weekends and "had a conversation" with Mr. Schneider about the two employees sharing call duties more equally.  Pl.'s Opp. Mem., Ex. YY, Harris Dep. 101:7-12.  After this conversation, Mr. Harris made an "on call schedule" with the two employees, but the schedule "was never really adhered to."  *Id.* at 155: 19-22.  Instead, Harris said, "Dave Benedict was close to and was comfortable taking call every weekend."  *Id.*  Mr. Harris also instructed both Mr. Benedict and Mr. Schneider to provide

contact phone numbers to shift supervisors so that they would be reachable in case of after-hours maintenance emergencies. *Id.* at 168:21-25, 160: 1-6.

At 3:21 p.m. on the afternoon of Saturday, July 21, 2012, a staff member at the Windham Facility called Mr. Harris on his cellphone to report a maintenance issue relating to the Facility's heating system. Def.'s L.R. 56(a) Stmt., ¶14. The record does not make clear the exact nature of the problem, but the parties suggested at oral argument that it resulted in a patient's room becoming uncomfortably hot. Mr. Harris left a voicemail on Mr. Schneider's cellphone about the issue. *Id.* Mr. Schneider had kept his phone in his truck while helping his son with an errand and did not hear the voicemail until approximately 7:30 p.m., over four hours later. *Id.* at ¶17. At 7:54 p.m. Mr. Harris contacted the Facility and learned that Mr. Schneider had neither communicated with any Facility staff nor otherwise addressed the problem. *Id.* at ¶15. Mr. Harris also called Mr. Benedict around this time. *Id.* at ¶45; *Id.* at Ex. B, Harris Aff., ECF 63-3, ¶9. Shortly thereafter, Mr. Benedict went to the Facility to fix the broken heater. *Id.* At 8:46 p.m., more than an hour after hearing Mr. Harris' voicemail, Mr. Schneider sent a text message to Mr. Harris, stating that he was "on his way in" to the Facility. Def.'s L.R. 56(a) Stmt., ¶16. Mr. Harris responded that Mr. Benedict had resolved the issue. *Id.*

Mr. Harris tried to reach Mr. Schneider for another maintenance issue on Sunday, July 22, 2012. Shortly before 7:00 p.m. that day, the Windham Facility's Director of Nursing contacted Mr. Harris about a ceiling leak. Def.'s L.R. 56(a) Stmt., ¶19. Mr. Harris instructed the Facility staff to "monitor" the leak by putting a bucket beneath it to catch the water. Pl.'s L.R. 56(a) Stmt., ¶20, citing Harris Dep., Ex. YY, 145:11-23. A couple of hours later, Mr. Harris called Mr. Schneider's cell phone twice—at 9:35 p.m. and 9:37 p.m.—and Mr. Schneider did not answer either time. Def.'s L.R. 56(a) Stmt., ¶21. Mr. Harris left a voicemail for Mr. Schneider about the incident. *Id.* Mr.

Schneider did not respond to Mr. Harris's voicemail about the leak until the next day because he

again had left his cell phone in his truck from 8:00 a.m. Sunday morning until Monday morning.

Def.'s L.R. 56 Stmt., ¶¶24-25; Pl's L.R. 56 Stmt., ¶25, citing Ex.3, Schneider Aff., ¶16.

Mr. Harris also tried to contact Mr. Benedict on July 22.  *Id.* at ¶22.  The record does not

establish when he attempted to contact Mr. Benedict or whether he left a message for Mr. Benedict.

Pl.'s L.R. 56(a) Stmt., ¶22.  Mr. Harris testified that he does not believe he heard from Mr. Benedict

on that day.  *Id.* at Ex. YY, Harris Dep., 167:14-18.

Mr. Harris testified that he called Mr. Schneider before calling Mr. Benedict on July 21 and

22 because he knew that Mr. Benedict had to attend a family funeral and was "not going to be able to

take call on that particular weekend."  Pl.'s Opp. Mem., Ex. YY, Harris Dep., 140: 12-14.  In his

deposition, he stated:

> I recall going back a day or two before the weekend.  [Mr. Schneider's] assistant,
> David Benedict, lost his step father, passed away.  Based upon what [Mr. Benedict]
> said he had to do and responsibilities that he had up to and including the weekend,
> that he was not going to be able to take call on that particular weekend.  I recall
> having a conversation with [Mr. Schneider] specifically, and I can't said that it was
> the Thursday or Friday before, and that conversation was about the need to have John
> take call, be responsible to the building because [Mr. Benedict] had other personal
> matters that he had to attend to.

*Id.* at 140: 8-20.  Mr. Schneider claims that Mr. Harris created this justification after the fact,

citing an affidavit from Mr. Benedict stating that he "did not have any conversations with Mr. Harris

regarding my stepfather's passing impacting that upcoming weekend's on-call coverage."  Pl.'s Opp.

Memo, 13, citing Ex. 4, Benedict Aff., ¶14.  It is unclear from Mr. Harris's testimony and Mr.

Benedict's affidavit whether the two men present conflicting versions of their conversation or

whether Mr. Harris's statement implies only that Mr. Harris decided that the passing of Mr.

Benedict's stepfather would impact Mr. Benedict's weekend availability, even if Mr. Benedict did

not himself suggest that in conversation.

6

On July 24, 2012, Mr. Harris issued a Notice of Corrective Action – Final Written Warning to Mr. Schneider regarding his unavailability over the weekend.  In the Notice, Mr. Harris specified that "[o]n both 7/21 (Sat) and 7/22 (Sun) John either did not respond, or did not respond timely to telephone calls made to both his home phone & cell phone when conditions at the facility necessitated his response and subsequent presence at the facility."  Def.'s L.R. 56(a) Stmt., Ex. B-1, Not. of Corrective Action.  He added that:

> As the supervisor of the maintenance department, John must be responsive to the needs of the facility.  Home & Cell phone #'s must be available to nursing supervisors, and VM messages must be responded to timely.

*Id.*  In the Notice, Mr. Harris also indicated that there were no "Prior Disciplinary Notices on File" for Mr. Schneider.  *Id.*  He added that Mr. Schneider would be terminated if "the same violation occurr[ed] again."  *Id.*  Mr. Harris then presented Mr. Schneider with the warning and Mr. Schneider signed it on July 28, 2012.  *Id.*, see also Def.'s L.R. 56(a) Stmt., ¶28.

On Monday, July 23, before issuing the warning, Mr. Harris spoke with Mr. Vera about the incidents.  Mr. Vera remembered at deposition that Mr. Harris merely expressed "his frustration with his inability to reach" Mr. Schneider and did not ask for guidance about what to do.  Pl.'s Opp. Mem., Ex. XX, Vera Dep., 14: 9-14.  Because Mr. Harris was Mr. Vera's "direct report," Mr. Harris testified that he wanted to "inform him of the circumstances and what [his] decision was."  *Id.* at 80: 7-8.  Mr. Harris added that the decision to issue a Final Written Warning was Mr. Harris's although Mr. Vera "concurred."  Pl.'s Opp. Mem. Ex. YY, Harris Dep., 80: 10.

### 2.  Mr. Schneider's Preparation for Hurricane Sandy

In late October 2012, the Facility began preparations in advance of Hurricane Sandy, which was expected to make landfall in the area on the afternoon of Monday, October 29, 2012.  Def.'s L.R. 56(a) Stmt., ¶31.  On Thursday, October 25, 2012, Mr. Schneider checked the fuel level in the

Facility's five 125-gallon propane tanks, which fueled the Facility's generator. *Id.* at ¶31. He contacted the Facility's propane fuel provider, AmeriGas, in order to "top off" the Facility's propane tanks in advance of the storm. *Id.* Later that day, Mr. Schneider informed Mr. Harris that the Facility was on AmeriGas's "priority list," and should receive the gas delivery the following day. *Id.* at ¶33. *See also id.* at Ex. B-3, 10/25/2012 e-mail correspondence.

Mr. Schneider worked at the Facility on both Friday, October 26 and Saturday, October 27, 2012. Def.'s L.R. 56(a) Stmt., ¶¶34-36. While he was on site, he did not check the propane tanks to determine whether the fuel had been delivered. Pl.'s L.R. 56(a) Stmt., ¶31. He assumed that AmeriGas delivered the fuel, because the company had always completed deliveries as scheduled in his 14 years of experience at the Facility. *Id.*, citing Ex. 3, Schneider Aff., ¶33; *Id.* at Ex. ZZ, Schneider Dep., 189: 11-17; 177: 13-16.

On Monday, October 29, at approximately 6:00 a.m., Mr. Schneider checked the generator's tanks and realized that AmeriGas had not refilled them. Pl.'s L.R. 56(a) Stmt., ¶36. He contacted AmeriGas using both the company's local and national numbers. *Id.* He continued to call the local number until the morning meeting. *Id.* He informed Mr. Harris about the gas shortage upon Mr. Harris's arrival to the Facility at approximately 8:00 a.m. *Id.*

Mr. Harris and Mr. Schneider met privately after a scheduled Monday morning meeting, and Mr. Harris "expressed [his] disappointment" with the situation. Pl.'s Opp. Mem., Ex. YY, Harris Dep., 207: 13-19. He also asked Mr. Schneider for AmeriGas's contact information. *Id.* He then dismissed Mr. Schneider from his office and began calling the company. *Id.* at 207: 1-4, 25. *See also* Def.'s L.R. 56(a) Stmt., ¶¶36-38. Mr. Harris learned that AmeriGas was taking its trucks off the road in advance of the storm and would not be able to deliver fuel to the Windham Facility before the

hurricane. *Id.* at ¶39. With the assistance of other staff-members, but not Mr. Schneider, Mr. Harris secured a propane delivery to the Windham Facility from another provider. *Id.* at ¶40.

Mr. Harris felt that Mr. Schneider had not been "part of the effort to secure a propane provider to deliver propane to the Windham Facility before the hurricane." Def.'s L.R. 56(a) Stmt. ¶41. He was especially "concerned" by Schneider's "lack of urgency." *Id.* at ¶42. He also thought that Mr. Schneider was "aloof" when the two men spoke in his office on Monday. Pl.'s Opp. Mem., Ex. YY, Harris Dep., 209: 2. When he remembered the incident, Mr. Harris said that he "would have liked to have seen some emotion, some acknowledgement that we were in crisis … [he] wanted to see concern, and [he] didn't see it." *Id.* at 233: 1-5. Mr. Harris felt that Mr. Schneider's "fourteen years of exemplary performance [did] not negate the seriousness of [the weekend's] incidents." *Id.* at 230: 21-22.

Mr. Schneider questions the urgency of the situation that Mr. Harris described. He claims that, even without the additional propane delivery, there would have been enough fuel in the tanks on Monday morning to power the Facility through 5:00 p.m. on Tuesday. Pl.'s L.R. 56(a) Stmt, ¶43, citing Ex. ZZ, Schneider Dep., 190: 5-191: 3. He adds that the Facility was part of a "mutual aid group," which ensured its access to thirty fuel vendors in case of emergency. *Id.*

### 3. Mr. Schneider's Termination

After Hurricane Sandy, Mr. Harris spoke with Mr. Vera about Mr. Schneider's behavior during the preparation for the storm. Pl.'s Opp. Mem., Ex. YY, Harris Dep., 82: 1-6. In this conversation, he told Mr. Vera that his "recommendation was termination." *Id.* Mr. Vera suggested that Mr. Harris write an e-mail to certain Ciena staff members, but otherwise did not ask questions about Harris's recommendation. *Id.* at 83: 1-6. Mr. Harris wrote an e-mail to Mr. Vera, Ms. Halsey,

Chief Operating Officer at Ciena, and Ms. Erwin, VP of Human Resources at Ciena.  *See* Def.'s L. R. 56(a) Stmt., Ex B-5.

In the e-mail, he said that Mr. Schneider "was negligent in assuring the safety and well-being of our building and our residents by not following up on the fuel delivery" and suggested that Mr. Schneider be terminated.  *Id.*  All of these higher-level executives agreed in response e-mails that termination was appropriate.  *Id.*  Mr. Harris then wrote another e-mail suggesting that the company pay Mr. Schneider for his accrued Paid Time Off ("PTO"), despite the fact that this was not required by company policy.  *Id.*  He noted that "other than the warning from July, a recent event, [Mr. Schneider's] personnel file is clean."  *Id.*  Mr. Vera responded to say that this would be "appropriate given [Schneider's] longevity" and because another employee had been given a similar payoff when she was terminated.  *Id.*

As noted above, Mr. Harris also indicated Mr. Schneider's age and date of hire in the e-mail. He testified that he was "simply trying to provide some background and some demographic information," and that he had "no idea" of Mr. Schneider's age before writing the email.  Pl.'s Opp. Mem., Ex. YY, Harris Dep., 232: 14-17.

On November 9, 2012, Mr. Harris formally terminated Plaintiff's employment at Regency Heights. Def.'s L.R. 56(a) Stmt., ¶47.  Mr. Harris then offered Mr. Schneider's position to David Benedict (age 48), who declined, and then to Thomas Stratton (age 52).  *Id.* at ¶48; Pl.'s L. R. 56(a) Stmt., ¶48, citing Ex. YY, Harris Dep., 244:3-7.  *See also id.* at Ex. 4, Benedict Aff., ¶¶19-20.  Mr. Stratton accepted Mr. Harris's offer and began working as the Maintenance Director at Regency Heights on December 3, 2013.  *Id.*

The record contains a chart entitled "Regency Heights of Windham -Terminated Employees: 1/1/2011-4/30/2013."  Pl.'s Opp. Mem., Ex. 15, Hooker Dep. Exhibits in 3:13-CV-00121-AVC at

Ex. 15 (chart).  The chart suggests that the Facility terminated a number of employees in the two-year period surrounding Mr. Schneider's firing.  Based on the information contained in the chart, the mean age of the terminated employees was 38 years old and the majority of the terminated workers were under 40.[2]   However, when limited to employees terminated due to "job performance" like Mr. Schneider, the mean age of termination was 51.5 years.  *Id.*  Among this group, all of the terminated employees were younger than Mr. Schneider but none was under 40.  *Id.*

### 4.  Progressive Discipline at Regency

Mr. Schneider argues that the Facility's employee manual "called for" progressive discipline of employees whose work performance was unsatisfactory.  *See* Pl.'s Opp. Mem., 17; *Id.* at Ex. 16, ECF No. 66-15, Schneider Dep. Exhibits (Ex. 4: Regency Heights of Windham Employee Handbook), p. 10-28.  He claims that Mr. Schneider's supervisors did not afford him the opportunity to reform his alleged misbehaviors, despite the company's stated interest in progressive discipline. More specifically, the Manual confirms that supervisors have the discretion to institute corrective action, including counseling and warnings, after an employee's misbehavior.  It also allows employees to dispute a supervisor's disciplinary action.  The Manual states that:

> If a supervisor concludes that any improper conduct or deficient work performance
> has occurred, corrective or disciplinary action may be taken. Whether the action
> involves counseling, the issuance of a warning, or dismissal is within the facility's
> discretion. If you believe that any disciplinary action, up to and including discharge,
> is improper, you should use our complaint resolution procedure.

*Id.* at Sec. 6, p. 17.  While the Manual does not require progressive discipline, many supervisors, including Mr. Schneider's, employed progressive disciplinary measures in many cases.  Mr. Vera stated that a performance improvement plan ("PIP") "was a tool that was used at [Ciena]."  Pl.'s Opp. Mem., Ex. WW, Vera Dep. in 13-cv-00121-AVC, 465: 11-12.

---

[2] Specifically, 29 of the 63 employees were over 40, and the average age of the terminated employees was 38.25 years.

For example, Mr. Vera placed Jarret McClurg, then-Administrator of a Regency Heights Facility in Norwalk, on a 30-day PIP because of Mr. McClurg's unresponsiveness to various maintenance issues.  Mr. McClurg's PIP states that he, among other things, did not give "clear direction [during] recent storm Sandy" and "lacked a sense of urgency."  Pl.'s Opp. Mem., Ex.16, Hooker Dep. Exhibits in 3:13-CV-00121-AVC (Ex. 56: McClurg Performance Improvement Plan). Mr. McClurg was 44 years old.  *Id.*

In June of 2012, Mr. Harris placed Ms. Louise Couch, then Dietary Service Manager at the Facility, on a PIP.  Pl.'s Opp. Mem., Ex. RR, Couch PIP.  The PIP identified Ms. Couch's lack of "follow through."  *Id.*  A follow up report indicated that she had, among other things, left the Facility at 3:00 p.m. on a day when the dining room was unexpectedly closed and allowed the kitchen to run out of milk.  *Id.*  Ms. Couch was then 46 years old.  *Id.*

### 5.  **Mr. Vera's Alleged Statements about Age**

While Mr. Harris initiated the termination of Mr. Schneider, Mr. Schneider points to several pieces of evidence concerning Mr. Vera's animus towards older workers in his brief opposing summary judgment.  All of these allegations arise from disputed testimony provided by John Hooker, a former employee of the Facility who filed an age discrimination case against the same Defendants also pending before this Court (Covello, J.).  *See* Ruling on Def.'s Mot. Sum. J., 3:13-CV-00121(AWC), ECF No. 73.  Mr. Hooker worked as the Administrator of the Facility in 2009, when Regency Heights became the operator, until January 12, 2012, when he was terminated.  *Id.* at 8.

Mr. Schneider submits an affidavit from Mr. Hooker alleging that Mr. Vera made several statements about Mr. Hooker's age before Mr. Hooker was fired.  *See* Pl.'s Opp. Mem., Ex. 5, Hooker Aff., ¶14.  Mr. Hooker had known Mr. Vera for over twenty years because Vera once completed an administrator-in-training program under Hooker.  Ruling on Def.'s Mot. Sum. J., 3:13-

CV-00121(AWC), 6.  The two had also attended various conferences and seminars together.  *Id.*  Mr. Hooker states that Mr. Vera, upon meeting Mr. Hooker in September 2011, remarked that he was surprised that Hooker had not already retired.  Pl.'s Opp. Mem., 19, citing Ex. SS, Hooker Dep. in 3:13-CV-00121-AVC, 71: 16-18; *Id.* at Ex. 5, Hooker Aff. ¶14.  According to Hooker, Mr. Vera also boasted about his termination of long-term employees at another company and referred to older workers as "deadwood."  *Id.*  Mr. Vera does not recall saying to Hooker that he was surprised that Hooker had not yet retired.  *Id.* at Ex. XX, Vera Dep., 57: 20-24.

Mr. Schneider also cites Mr. Vera's treatment of Grace Flight, former Administrator of the Regency Heights facility in Stamford.  In December, 2014, Ms. Flight filed an internal complaint with Regency Heights/Ciena alleging age discrimination.  Pl.'s Opp. Mem., 21.  In this complaint, Ms. Flight alleged that Mr. Vera asked her about her retirement plans in November 2014.  After Flight said that she had no plans to retire, Mr. Vera allegedly "pressured" her to leave.  *Id.* at 21.[3]

Mr.  Schneider provides far less evidence that suggesting that Mr. Harris was biased against older workers, with the exception of an affidavit from Mr. Benedict claiming that "[w]hen Mr. Harris informed me that Mr. Schneider was terminated, Mr. Harris said that Mr. Schneider 'has been here too long,' and 'got too comfortable.'"  Pl.'s Opp. Mem. Ex. 4, Benedict Aff. ¶19.

### 6.  Decision-making Responsibilities at the Facility

Defendants list Mr. Harris, Mr. Vera, Ms. Erwin and Ms. Halsey as the "persons known to the Defendants who were involved in making the decision" to fire Mr. Schneider.  Pl.'s Opp. Mem., Ex. QQ, Def.'s Initial Responses, 6 (n.b.).  Mr. Harris communicated with all three people about the decision, despite the formal distinctions between their employers.  Mr. Harris also said that he

---

[3] Ms. Erwin, the Ciena V.P. for Human Resources, allegedly investigated her complaint and concluded that Mr. Vera had not discriminated against Ms. Flight on the basis of her age.  *Id.* at Ex. UU, Erwin Dep., 54:1-16.  At his deposition in *Hooker*, Mr. Vera denied asking Ms. Flight about her retirement plans and stated that he did not know about her internal complaint.  Pl.'s Opp. Mem., 20.  Ms. Flight left her position voluntarily in July 2015.  *Id.* at n.

understood that "approval needed to be gained by Ciena in order to make any decision" concerning employment.  Pl.'s Opp. Mem., Ex. YY, Harris Dep., 84: 14-16.  Mr. Harris "didn't see [Ms. Halsey] as being from a different company."  *Id.* at 83:25.  About Ms. Erwin, Mr. Harris only confirmed that she, as the Vice President of Human Resources for Ciena, "also weigh[ed] in on the decision to terminate John Schneider."  *Id.* at 84: 23-25.

The three companies shared many responsibilities for managing the Facility's staff.   Some of Defendants' workplace documents were managed jointly.  For example, Mr. Vera testified that Ciena and Regency Healthcare Management used the same document to state both companies' workplace drug and alcohol policies, which were the same.  Pl.'s Opp. Mem., Ex. WW, Vera Dep. in 13-cv-00121, 43: 17-18 ("It's one and the same policy … for both entities.").  Many of Regency Healthcare Management's files were stored at Ciena's home office in Michigan.  *Id.* at 461: 16-25.

## II.   Standard of Review

In a motion for summary judgment, the burden is on the moving party to establish that no genuine issues of material fact remain in dispute and that it is thus "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law" and a factual issue is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In reviewing the record, this Court must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citations omitted).  If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is

29.

inappropriate.  *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004); *Anderson*, 477 U.S. at 250 (summary judgment is proper only when "there can be but one reasonable conclusion as to the verdict").

In determining whether summary judgment is appropriate, the Court must consider only admissible evidence.  *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence") (citation and internal quotation marks omitted); Fed. R. Civ. P. 56(e).

### III.   Discussion

Mr. Schneider claims that Defendants discriminated against him based on his age, in violation of ADEA and CFEPA. The Court addresses each of these claims in turn.  As a preliminary matter, the Court addresses whether the claims of age discrimination should remain against all three Defendants.  Obviously, if there is no basis for a claim against one or more of the Defendants, then any such defendant should be dismissed from the case now.  For now, the answer to that question is yes.  If the claims of age discrimination proceed against any of the Defendants, they should proceed against all of them.

#### A.      Joint Liability of the Three Defendants

Mr. Schneider alleges that all three Defendants are jointly liable for discriminating against him.  At this stage of the proceeding, defendants have not contested this fact.  The three companies are formally separate entities.  Mr. Schneider was employed by defendant Regency Heights.  Mr. Vera and Mr. Harris were employees of Regency Healthcare Management, a management consultant employed by Regency Heights.  Ms. Erwin and Ms. Halsey were employed by Ciena.

Courts in the Second Circuit have used the "single employer" or "integrated employer" test, which was originally developed by the National Labor Relations Board, to assess whether two employers can be jointly liable for an allegedly discriminatory employment decision. *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1237 (2d Cir. 1995) ("We believe that the appropriate test under Title VII for determining when parent companies may be considered employers of a subsidiary's employees is the four-part test adopted by the Fifth, Sixth, and Eighth circuits"); *Woodman v. WWOR-TV, Inc*., 411 F.3d 69, 89 (2d Cir. 2005) (using the "joint-employer" theory in an ADEA case). This test requires an analysis of four factors: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Cook*, 69 F.3d at 1237.

When two companies collaborated in employment decisions, they may be considered a joint enterprise for the purposes of discrimination liability. *Brown v. Daikin Am., Inc*., 756 F.3d 219, 227 (2d Cir. 2014). In other words, as the Second Circuit has stated, centralized control over labor relations is "the most important prong in the four-part test." *Id.*, citing *Cook*, 69 F.3d at 1240. To determine whether two companies shared "centralized control over labor relations," a court must assess "what entity made the final decisions regarding employment matters related to the person claiming discrimination." *Id.* "Day-to-day control over labor relations" is not required. *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 156-57 (2d Cir. 2014) (internal quotation marks omitted). Rather, the plaintiff "must show only that the corporate parent's involvement is sufficient and necessary to the total employment process, even absent total control or ultimate authority over hiring decisions." *Id.* In *Turley*, the Second Circuit held that plaintiff had made a sufficient showing of an integrated enterprise when there was "some evidence that the parent company was directly and necessarily involved in decisions relating to the plaintiff's employment .... and [that] complaints

16

about harassment [at defendant subsidiary] were reported to the corporate [parent's] human resources department." *Id.*

At this stage, the three Defendants should be considered joint employers because individuals from the three corporations played integral roles in Mr. Schneider's termination and in employment decisions more generally. Mr. Harris testified that he didn't see Ms. Halsey and Ms. Erwin, who were both employees of Ciena, "as being from a different company" and that he understood that "approval needed to be gained by Ciena in order to make a decision" to terminate an employee. Mr. Harris frequently consulted with Mr. Vera, an employee of Regency Healthcare Management, about management decisions. At one point, he was told by Mr. Vera that Mr. Schneider's work had been unsatisfactory. Finally, both Schneider and Harris had access to e-mail addresses at "regencyhc.com," much like Mr. Vera did. *See Echevarria v. Insight Med., P.C.*, 72 F. Supp. 3d 442, 462 (S.D.N.Y. 2014) (concluding that two corporate entities were "a single integrated employer" when plaintiff was given email addresses for both entities). There is also some suggestion that the companies were jointly owned.[4]

Moreover, Mr. Schneider has presented evidence that representatives of all Defendants knew of his age when he was terminated. The Second Circuit has maintained that two separate employers cannot be jointly liable unless the plaintiff can show that the employer that "actually made the discharge decision" was aware of the plaintiff's age. *Woodman*, 411 F.3d at 89. In *Woodman* the Second Circuit required proof that plaintiff's formal employer communicated that information about plaintiff's age to the subsidiary who actually made the discharge decision or proof that the parent company had "itself played a decision-making role in that discharge." *Id.* The record here makes clear that employees of both Regency Healthcare and Ciena knew of Mr. Schneider's age when they

---

[4] In a footnote in his brief, Mr. Schneider adds that Mohammed Qazi owned all of the Defendants and all financial and budgetary decisions were made by Ciena. Defendants have not responded to this statement.

read Mr. Harris's e-mail suggesting termination. The record also establishes that these decision-makers all concurred in the decision to terminate Mr. Schneider.

For purposes of deciding this motion, the Court concludes that the three entities were "joint employers" for the purposes of Mr. Schneider's discrimination suit. It is entirely possible that the evidence presented at trial will reveal an insufficient degree of integration between the three Defendants, but at this stage in the litigation, the Court presumes that all of three Defendants must face trial on Mr. Schneider's claims, if any of them have to face trial.

**B. The Burden Shifting Framework for Mr. Schneider's ADEA and CFEPA Claims**

Under ADEA, it is unlawful for an employer to "discharge any individual because of such individual's age [or] to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age[.]" 29 U.S.C. § 623(a). The CFEPA is generally "coextensive" with federal anti-discrimination statutes and similarly prohibits employers from discriminating or retaliating against individuals because of their age. *See Brittell v. Dep't of Corr.*, 247 Conn. 148, 164 (1998); Conn. Gen. Stat. Ann. § 46a-60(a).

Courts in the Second Circuit analyze claims for age discrimination under both ADEA and CFEPA using the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (using the *McDonnell Douglas* approach for an ADEA claim); *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 556 (2d Cir. 2010) ("The analysis of discrimination and retaliation claims under CFEPA is the same as under Title VII"); *Rubinow v. Boehringer Ingelheim Pharms., Inc.*, 496 F. App'x 117, 118 (2d Cir. 2012) ("Summary judgment motions in age discrimination cases under the ADEA and CFEPA are decided using the *McDonnell Douglas* burden-shifting test.").

Under the *McDonnell Douglas* burden-shifting framework, the plaintiff "bears the initial burden of establishing a prima facie case of discrimination." *Gorzynski*, 596 F.3d at 106. This creates a presumption that the employer unlawfully discriminated against the employee, thus placing upon the defendant "the burden of producing an explanation to rebut the prima facie case—*i.e.*, the burden of 'producing evidence' that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).

If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted and the burden shifts back to the plaintiff to present evidence that employer's proffered reason was a pretext for discrimination" or "by presenting facts, which taken in his favor, suffice to show that a triable issue exists as to whether his age was a 'but for' cause of his termination." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 168 (2d Cir. 2014) (internal quotation marks and citations omitted). To show that age was the "but for" cause of the employer's action, a plaintiff must show that age was "an antecedent but for which the result in question would not have occurred." *Burrage v. United States*, 134 S. Ct. 881, 888 (2014). A plaintiff can meet this burden even if age "combines with other factors to produce the result," as long as "the other factors alone would not have done so." *Id.* The plaintiff must, in other words, show that age was "the straw that broke the camel's back." *Id.*

### 1. Mr. Schneider's Prima Facie Case

In order to survive summary judgment, Mr. Schneider first must make out a prima facie case of discrimination. *Gorzynski*, 596 F.3d at 107. Specifically, he must show that (1) he was within the protected age group, (2) he was qualified for the Maintenance Supervisor position, (3) he experienced an adverse employment action and (4) such action occurred under circumstances giving

rise to an inference of discrimination.  *Id.*  This burden is "not a heavy one" and Mr. Schneider has

met it.  *Id.*

Mr. Schneider was sixty-three when he was fired by Defendants.  He had worked as

Maintenance Supervisor from 1998 to 2012 and was generally qualified for that work.  Defendants

fired him and offered his job to Mr. Stratton and Mr. Benedict, who were 11 and 18 years younger

than Mr. Schneider, respectively.  These age differences are "not insignificant." *Tarshis v. Riese*

*Organization*, 211 F.3d 30, 38 (2d Cir. 2000) (sixty-seven year old plaintiff made a prima facie case

when he was eight years older than his replacement); *Byrnie v. Town of Cromwell Bd. of Educ.*, 243

F.3d 93, 102 (2d Cir. 2001) (holding that rejection of plaintiff in favor of significantly younger

applicant, who was also over forty, can support an inference of age discrimination).  Mr. Harris

included Mr. Schneider's age in an email regarding his termination, so a fact-finder could reasonably

infer that Mr. Vera and the other decision-makers at issue were aware of Mr. Schneider's age and

surmised that he was older than his replacements.  *See Woodman*, 411 F.3d at 81 ("Without some

evidence that an employer knew that it was replacing an older worker with a younger one, intentional

discrimination cannot be the 'required conclusion.'").

## 2.  Defendants' Legitimate, Nondiscriminatory Reason

Defendants assert that "there was a legitimate, nondiscriminatory reason for terminating [Mr.

Schneider's] employment: his demonstrated poor job performance."  Def.'s Mot. for Summ. J., 9.

Specifically, they argue that Mr. Schneider failed to fulfill his job duties with appropriate urgency on

the weekend of July 21, 2012 and on the weekend before Hurricane Sandy's expected landfall.  *Id.*

As Mr. Schneider concedes, "an employer's dissatisfaction with an employee's work performance

can be a legitimate, nondiscriminatory reason for terminating employment."  Pl.'s Opp. Mem., 27,

referencing *Jarnutowski v. Pratt & Whitney*, 103 F. Supp. 3d 225, 237 (D. Conn. 2015).  Defendants therefore have successfully rebutted Mr. Schneider's prima facie case.

### 3.  Mr. Schneider's Evidence of Pretext

At *McDonnell Douglas*'s final step, the burden shifts once again to Mr. Schneider.  For his case to continue, Mr. Schneider must offer admissible evidence that would lead a reasonable factfinder to conclude by a preponderance of the evidence that his age was the "but for" cause of the Defendants' decision to fire him.  *See Gorzynski*, 596 F.3d at 107.  Mr. Schneider "may prevail only if [his] employer's proffered reasons are shown to be a pretext for discrimination, either because the pretext finding itself points to discrimination or because other evidence in the record points in that direction—or both." *Fisher v. Vassar Coll.*, 114 F.3d 1332, 1339 (2d Cir. 1997).  Mr. Schneider points to several pieces of evidence in the record to raise the inference that Defendants discriminated against him because of his age.  While there are admissibility issues with much of Mr. Schneider's proffered evidence, on the whole, it is sufficient to survive judgment, even if some or all of it may later be ruled inadmissible following a motion *in limine* or in the context of a trial.

### a.  Use of Mr. Schneider's Age in the Termination E-Mail

Mr. Harris indicated Mr. Schneider's age in the e-mail regarding his termination.  While age notations alone are not enough to suggest discriminatory intent, a jury could find that this notation, with more information, suggested Defendants' animus towards older workers.  *See Armbruster v. Unisys Corp.*, 32 F.3d 768, 781-82 (3d Cir. 1994) (holding that handwritten age notations in employer documents alone are not sufficient evidence of discriminatory animus, but admitting the notations in that they "may be related to the adverse employment decision [and] they may be introduced as evidence of pretext, so long as they are otherwise admissible.")

### b.  Inconsistencies in Mr. Harris's Reasoning

Mr. Schneider also argues that Mr. Harris's responses to his two 2012 missteps were "extreme," "implausible" and "inconsistent."  Pl.'s Opp. Mem., 29.  First, Mr. Schneider claims that Mr. Harris was inconsistent when he testified that he thought that Mr. Benedict was at a funeral on the weekend of July 21.  Mr. Harris referenced the family funeral in his testimony to justify his insistence that Mr. Schneider, and not Mr. Benedict, respond to the weekend calls.  However, Mr. Schneider has put forth evidence—Mr. Benedict's affidavit—that Mr. Harris did not know of the funeral until after the incident occurred, suggesting that Mr. Harris could have targeted Mr. Schneider for discipline and then created an explanation afterwards.

Additionally, Mr. Schneider calls into question Mr. Harris's stated motivation for disciplining Mr. Schneider so harshly. Mr. Harris claimed that urgency was of the utmost importance when the Facility heating system malfunctioned on July 21, 2012.  However, he waited for four hours to check on the facility after calling Mr. Schneider.  *Id.* at 6.  Similarly, he waited several hours before calling Mr. Schneider after he learned about the leak in the ceiling on July 22, 2012.  *Id.*  Mr. Schneider argues that Mr. Harris's delays call into question his proffered reason for disciplining Mr. Schneider.

While this evidence is limited, it could lead a jury to question Defendants' reasons for Mr. Schneider's termination. A defendant's explanation for a particular employment decision is pretextual if it is internally inconsistent or shifts over time.  In *Byrnie*, the Second Circuit denied summary judgment because a jury could believe that defendant's proffered reason for not hiring plaintiff Byrnie "was the result of an attempt to salvage an earlier explanation that was collapsing." *Byrnie*, 243 F.3d at 106.  *See also DeMarco v. Holy Cross High School*, 4 F.3d 166, 171 (2d Cir. 1993) (the pretext inquiry takes into consideration "whether the putative non-discriminatory purpose was stated only after the allegation of discrimination").  While judges should not "second guess" the reasonableness of business judgments, the *Byrnie* court explained, an employer's "subjective

22

explanation, besides being clear and specific, must be honest." *Byrnie*, 243 F.3d at 105. By pointing to irregularities in Mr. Harris's testimony—and thus calling into question Mr. Harris's motives—Mr. Schneider raises a genuine issue about whether Mr. Harris's asserted reason for firing him was pretextual.

### c. Statements by Mr. Vera and Mr. Harris

Mr. Schneider points to statements made by Mr. Vera and Mr. Harris that arguably could help a reasonable finder of fact infer that age was the "but for" cause of his dismissal. "[S]tray remarks, even if made by a decision-maker, do not constitute sufficient evidence to make out a case of employment discrimination." *Danzer v. Norden Sys.*, 151 F.3d 50, 56 (2d Cir. 1998). However, when combined with other "indicia of discrimination, … the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance." *Id.*

Mr. Schneider presents evidence of several remarks that could suggest to a reasonable fact finder the "ominous" intentions of Mr. Harris. Most importantly, Mr. Harris allegedly told Mr. Benedict that Schneider "ha[d] been here too long" after he was fired. He also included Mr. Schneider's age in the email suggesting his termination.

Mr. Schneider also points to several of Mr. Vera's statements to suggest his animus towards older workers. All of these statements arise from disputed testimony provided by John Hooker, a former employee at the Facility who filed an age discrimination claim against the same Defendants in 2013. Mr. Schneider submits an affidavit from Mr. Hooker alleging that Mr. Vera, upon meeting Mr. Hooker, remarked that he was surprised Hooker had not already retired. He further alleges that Mr. Vera boasted about his termination of long-term employees at another company and referred to older workers as "dead wood." Mr. Vera does not recall whether he had said to Hooker that he thought Hooker would have retired. If Plaintiff succeeds in proving that Mr. Vera made these remarks, a jury

23

could find that the remarks suggest that Mr. Vera—an arguably key decision-maker in Mr. Schneider's termination—acted with a discriminatory motive.[5]   The Court, however, notes that the admissibility of this evidence is uncertain, as discussed below.

### d.   "Me too" Evidence

Mr. Schneider also presents evidence of Ciena's and Mr. Vera's treatment of two other employees, Mr. Hooker and Ms. Flight, to suggest Mr. Vera's discriminatory motive.   The parties describe this evidence as "'me too' evidence."   *See Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 386-88 (2008).   In *Mendelsohn*, the Supreme Court considered the admissibility of non-party co-worker testimony—or "'me too' evidence"—in an employment discrimination case, holding that such evidence was neither *per se* admissible nor *per se* inadmissible, but rather should be admitted on a case-by-case basis.   *Id.*

There are a number of factors that courts should consider when determining the admissibility of "me too" evidence, including "(1) whether the evidence is logically or reasonably tied to the decision made with respect to the plaintiff; (2) whether the same 'bad actors' were involved in the 'other' conduct and in the challenged conduct; (3) whether the other acts and the challenged conduct were in close temporal and geographic proximity; (4) whether decision makers within the organization knew of the decisions of others; (5) whether the other affected employees and the plaintiff were similarly situated; and (6) the nature of the employees' allegations."   *See Murray v. Miron*, No. 3:11 CV 629 (JGM), 2015 U.S. Dist. LEXIS 135311, at *11-12 (D. Conn. Oct. 5, 2015). Furthermore, even when "me too" evidence is relevant under Rule 401, the district court retains

---

[5] Defendant argues that Mr. Hooker's testimony about Mr. Vera's statements is "inadmissible hearsay."  Federal Rule of Evidence 801(d)(2) specifically provides that a statement is not hearsay if it is offered against a party and is either "(A) the party's own statement, in either an individual or a representative capacity or ... (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."  The speaker does not have to be the "final decision-maker," but simply "an advisor or

discretion to exclude that evidence, under Rule 403, if it is "unduly prejudicial, confusing, misleading, or cumulative." *Adams v. Austal, U.S.A., LLC*, 754 F.3d 1240, 1258 (11th Cir. 2014).

The Court notes that *Mendelsohn* primarily concerns "testimony by nonparties alleging discrimination at the hands of persons who played no role in the adverse employment decision challenged by the plaintiff." *Mendelsohn*, 553 U.S. at 383. Most of the material that the parties describe as "me too" evidence concerns Mr. Vera. Mr. Vera allegedly played a role in Mr. Schneider's termination by counseling Mr. Harris, which might make the *Mendelsohn* inquiry unnecessary. *Mendelsohn*, however, requires courts to consider factors that are important in every evidentiary question, including the prejudicial, misleading or cumulative nature of the proposed evidence. Whether or not *Mendelsohn* strictly applies, these questions will be essential to this Court's evaluation of Mr. Schneider's evidence.

The "me too" evidence that Mr. Schneider presents may be relevant because it concerns Mr. Vera, who was allegedly a key player in the decision to terminate Mr. Schneider. However, while Mr. Vera supported Mr. Harris's decision to terminate Mr. Schneider, Schneider's "me too" evidence concerns decisions made by Mr. Vera alone. While Mr. Vera played a role in Mr. Schneider's termination, he played a greater role in supervising Mr. Hooker and Ms. Flight. As a result, Mr. Schneider was not similarly situated to Hooker and Flight with respect to Mr. Vera, making the evidence of their treatment less relevant to his case.

More importantly, the "me too" evidence that Mr. Schneider presents is conclusory, based mostly on allegations that Mr. Hooker and Ms. Flight made in preparation for filing internal or external age discrimination complaints. It is also disputed: Mr. Vera denies making many of the age-related statements that Hooker and Flight describe. While a reasonable jury could conclude that Mr.

---

significant participant in the decision-making process that is the subject matter of the statement." *U.S. v. Rioux*, 97 F.3d 648, 661 (2d Cir. 1996).

Vera did make these statements, the risk of prejudice against Defendants must be balanced against the potential probative value of the statements themselves.  Mr. Hooker's testimony about Mr. Vera's alleged statements therefore may not be admissible at trial.[6]

Although the Court is not inclined to admit this evidence at trial, at this stage of the case, the Court cannot properly make an admissibility determination and therefore will revisit this issue, if raised in a motion *in limine* or in the context of a trial.  *See Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 152 (2d Cir. 2010) (reviewing district court's assessment of "me too" evidence in a motion *in limine*, referencing the requirement of an "intensive context-specific inquiry") (internal citations omitted).

### e.  Individuals Similarly Situated to Mr. Schneider

Mr. Schneider also argues that Defendants treated him more harshly than they did younger employees, first by disciplining him, and not Mr. Benedict, for failing to respond while "on call," and second by denying him the benefit of progressive discipline policies that were offered to younger workers.  In order to raise the inference of discrimination, Mr. Schneider must point to evidence that suggests that these employees were similar to him in all material respects and that Defendants still disciplined them differently.

"When considering whether a plaintiff has raised an inference of discrimination by showing that she was subjected to disparate treatment, the plaintiff must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself."  *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).  "Similarly situated" employees are "subject to the same

---

[6] This determination may change depending on the form that Mr. Schneider's "me too" evidence takes at trial.  In *DeMarco*, the Second Circuit held that it was not an abuse of discretion to preclude plaintiff from testifying as to her co-workers' statements about their interactions with defendant employer, holding that the danger of undue prejudice was too great when "one of these employees testified at trial, and [plaintiff] did not witness any of the alleged events herself."  *DeMarco v. W. Hills Montessori*, 350 F. App'x 592, 594 (2d Cir. 2009).

performance evaluation and discipline standards" and "engaged in comparable conduct."  *Id.* at 40

(internal citations omitted).  "Whether two employees are similarly situated ordinarily presents a

question of fact for the jury."  *Id.* at 39.

In deciding whether two employees are similarly situated, the finder of fact should focus on

the standards and expectations of the employer as well as the employees' formal titles and ranks.

Although the relative position of employees in a company is "relevant to the analysis, employees

need not be of the exact same rank to be considered 'similarly situated.'"  *Gorzynski*, 596 F.3d 93 at

n.7.  For example, while "[s]upervisors are not similarly situated employees," a supervisor could be

similarly situated to her subordinates if they were subject to the same workplace standards.  *Prescod

v. Am. Broad. Co.*, 1985 U.S. Dist. LEXIS 21640, 1985 WL 430, at *14 (S.D.N.Y. Mar. 19, 1985).

The only viable employees identified by Mr. Schneider as similarly situated, Mr. Benedict, Mr.

McClurg and Ms. Couch, are not particularly strong comparators, but the Court believes that, at least,

two of these comparisons are sufficient at this stage of the litigation to assist in surviving summary

judgment.  The admissibility of any such evidence at trial, however, is not guaranteed, but is best

viewed in the context of a motion *in limine* or during a trial.

### i.     Mr. Benedict

Mr. Schneider argues that Mr. Harris and his co-defendants treated Mr. Schneider more

harshly than Mr. Benedict when both employees failed to promptly respond to requests for

maintenance on July 21 and 22, 2012.  The record suggests that both Mr. Benedict and Mr. Schneider

were expected to be "on call" during weekends.  Mr. Harris's testimony suggested that he relied on

Mr. Benedict for "on call" requests as much as he did on Mr. Schneider.  The record does not

establish which of the two men Mr. Harris believed would be on call on the weekend of July 21 and

22, 2012.  Mr. Harris testified that he believed Mr. Benedict should not be on call because he was at

a family funeral, but Mr. Schneider put forth evidence that calls this testimony into question. Generally, Mr. Harris wanted Mr. Schneider to be responsible for a greater number of on call requests and believed that Mr. Schneider was not sufficiently sharing "on call" duties with Mr. Benedict.

Mr. Schneider and Mr. Benedict each failed to respond to one of Mr. Harris's maintenance calls on the weekend of July 21 and 22, 2012.  Mr. Schneider took five hours to respond to Mr. Harris's voicemail concerning the malfunctioning heater on July 21, 2012.  Mr. Harris contacted Mr. Benedict later that evening.  While the record does not establish when Mr. Benedict learned about the maintenance issue, it is clear that he responded before Mr. Schneider did.  On July 22, Mr. Harris left a voicemail for Mr. Schneider concerning a ceiling leak.  Mr. Schneider did not respond until the next day.   Mr. Harris also tried to contact Mr. Benedict on that day. The record does not establish when he attempted to contact Mr. Benedict or whether he left a message for Mr. Benedict, but the parties agree Mr. Harris did not hear from Mr. Benedict on that day.  After the weekend, Mr. Harris issued a warning notice for Mr. Schneider because of his failure to promptly respond to maintenance requests while on call.  He did not discipline Mr. Benedict.

While the two employees may have been similarly situated when it came to being on call, it would be difficult for a reasonable factfinder to conclude that Mr. Schneider and Mr. Benedict engaged in comparable conduct.  While each employee failed to respond to Mr. Harris' phone call on July 22, Mr. Schneider was also untimely in his response to Harris' July 21 phone call.  Both employees were unresponsive, but Mr. Schneider was more unresponsive and expected to be more responsible, since he was Mr. Benedict's supervisor.  Comparing Mr. Schneider and Mr. Benedict would not aid the jury in establishing whether Defendants disciplined Mr. Schneider for discriminatory or pretextual reasons.

28

ii.       **Younger Employees who Received PIPs**

In his brief, Mr. Schneider argues that Defendants treated him less favorably than they did younger employees because they did not offer him the opportunity to reform his behavior using a "Performance Improvement Plan," or PIP.  Pl.'s Opp. Mem., 30.  While supervisors at the Facility were not required to use PIPs, some supervisors, including Mr. Vera, used them as "a tool" to reform employee behavior.  The record contains some evidence suggesting that Mr. Schneider's supervisors used PIPs with other employees.  Mr. Harris offered a PIP to Ms. Couch and Mr. Vera offered a PIP to Mr. McClurg.

In the Second Circuit, whether or not co-employees report to the same supervisor is an important factor in determining whether two employees are subject to the same workplace standards for purposes of finding them similarly situated."  *Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 465-66 (S.D.N.Y. 2006) (collecting cases); *but see Graham* at n. 1 (noting that the Second Circuit has not expressly adopted "the language of the *Mitchell* test," which requires, among other things, that "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor") (*citing Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).[7]

Mr. Schneider has put forth sufficient evidence for a jury to conclude that Mr. McClurg was similarly situated to Mr. Schneider but was disciplined differently by Mr. Vera and Mr. Harris.  Mr. Vera offered Mr. McClurg a PIP after McClurg, among other things, did not give "clear direction

---

[7] In this case, because the imposition of progressive discipline is a discretionary remedy, Mr. Schneider must show that his co-workers had the same supervisors—Mr. Vera and Mr. Harris—in order to suggest that they were similarly situated to him.  In his Opposition Memo, Mr. Schneider identifies several employees who received PIPs from various employees of defendants.  Pl.'s Opp. Mem., 18 and 30 (noting that Ms. Couch, Ms. Doyle, Mr. McClurg, and "Tim," the Maintenance Director in Norwich, all had the opportunity to create a PIP).  Besides Mr. McClurg and Ms. Couch, the other employees whose PIPs Mr. Schneider references were not under the purview of the decision-makers who disciplined Mr. Schneider: Doyle was managed and disciplined by Mr. Hooker, former Administrator at the facility and "Tim" was managed by Mr. McClurg.  Mr. Schneider therefore has not pointed to sufficient evidence to suggest that the other employees who received PIPs—Doyle and "Tim"—were similarly situated to him.

[during] recent storm Sandy" and generally "lacked a sense of urgency" regarding his duties.  Both Mr. McClurg and Mr. Schneider were disciplined because they were inattentive or unhurried in their response to problems at the Facility, so a reasonable jury could find that the two engaged in "comparable conduct."  Furthermore, despite the fact that Mr. McClurg's duties were, as defendant suggests, "far more expansive" than Mr. Schneider's, Harris and Vera had the same expectations of the two when it came to urgency and responsiveness.  *See* Def.'s Reply, 5.  To the extent that Mr. McClurg's duties were more expansive than Mr. Schneider's, one would expect Mr. Vera to discipline McClurg more harshly.  Finally, Mr. Vera disciplined Mr. McClurg and also supervised the discipline of Mr. Schneider.  The Court recognizes, though, that Mr. McClurg is not entirely similarly situated for the purposes of this analysis, since Mr. Vera directly supervised Mr. McClurg and only indirectly supervised Mr. Schneider.  Mr. Schneider's evidence about Mr. Vera's treatment of Mr. McClurg may end up being inadmissible, but this determination would be best addressed in a motion *in limine* or at trial, when this evidence can be placed in its proper context.

A jury could also find that Ms. Couch was similarly situated to Mr. Schneider.  In 2014, Mr. Harris criticized Ms. Couch's lack of "follow through" and disciplined her for many infractions, including not being on at work during an emergency at the Facility's dining hall.  Mr. Harris was concerned about Ms. Couch and Mr. Schneider for similar reasons.  A reasonable jury could use Ms. Couch as a comparator while evaluating Mr. Schneider's claims of discrimination.

Unlike Mr. McClurg and Ms. Couch, Mr. Schneider did not receive the benefit of a PIP or any performance improvement measures.  Despite Defendants' suggestion that the PIP is discretionary and therefore should not figure into the analysis of discrimination, a defendant's denial of a discretionary benefit can amount to different treatment.  *See* Def.'s Reply, 4.  A reasonable jury could find that, while the PIP process is discretionary, the fact that other employees received the

benefit of a PIP, when Mr. Schneider did not, could be evidence of a discriminatory animus against Mr. Schneider.

All in all, the Court finds that a reasonable jury could decide to find for Mr. Schneider under ADEA and the Court therefore denies summary judgment on Mr. Schneider's ADEA claim.

### 4.  Age Discrimination under the CFEPA

Mr. Schneider also claims that Defendants violated the age discrimination provisions in CFEPA.  While courts agree that discrimination claims under CFEPA should be analyzed using *McDonnell Douglas*'s burden-shifting framework, as discussed above, there is some uncertainty concerning the CFEPA claimant's burden after the defendant has articulated a legitimate, non-discriminatory reason for the adverse employment action at issue.  *Weisenbach v. LQ Management*, No. 3:13-cv-01663 (MPS), 2015 WL 5680322, at *7 (D. Conn. Sept. 25, 2015) (collecting cases).

Before the U.S. Supreme Court's decision in *Gross v. FBL Fin. Servs., Inc*, a plaintiff who brought a claim under the ADEA could survive a motion for summary judgment by demonstrating that her age was a "motivating factor" in the adverse employment action.  *Gorzynski*, 596 F.3d at 105-6, referencing *Gross*, 557 U.S. 167, 176 (2009).  In *Gross*, the Court held that an ADEA plaintiff must prove by the preponderance of the evidence that age was a "but for" cause of the adverse employment action and not merely a contributing or motivating factor.  *Id.*

Courts in Connecticut have not conclusively decided whether the motivating factor test still applies to age discrimination claims under CFEPA, or whether CFEPA decisions should follow post-*Gross* ADEA case law. *See Weisenbach* at *7 ("[N]either the Connecticut Supreme Court nor the Appellate Court has expressly addressed whether the 'motivating factor' standard still applies to CFEPA claims") (footnote omitted).  *See also Vale v. City of New Haven*, No. 3:11-cv-00632 (CSH), 2016 U.S. Dist. LEXIS 93635, at *16-*20 (D. Conn. July 19, 2016) (collecting cases to "emphasize

the lack of clarity in Connecticut law as to this question").  In *Weisenbach*, Judge Shea concluded that the "motivating factor" standard still applied to the CFEPA because Connecticut's trial courts continued to apply the standard under the CFEPA and no Connecticut appellate court had spoken on the question.  *Id.* at *8 ("I follow Connecticut trial courts in predicting that the Connecticut Supreme Court will continue to apply the more lenient 'motivating factor' standard to CFEPA discrimination claims.").

In this case, however, because the Court concludes that summary judgment is inappropriate even when applying the higher standard of "but for" causation under the ADEA, the Court need not determine whether the Connecticut Supreme Court would apply the "motivating factor" standard for CFEPA claims.  Because Mr. Schneider has satisfied the higher standard, the Court accordingly denies summary judgment on his CFEPA claim.

## IV.   Conclusion

For all of the reasons discussed above, Defendants' Motion for Summary Judgment [**Doc. No. 63**] is **DENIED**.

SO ORDERED at Bridgeport, Connecticut this 15th day of December, 2016.

/s/ Victor A. Bolden_____
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE